# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

JOHN MILLER, et al.,

      Plaintiffs,

  v.                             Case No. 2:98-cv-275

REGINALD WILKINSON, et al.,       JUDGE EDMUND A. SARGUS, JR.

      Defendants.

## OPINION AND ORDER

This class action case was filed on March 12, 1998. The plaintiffs, all devotees of the Asatru, or ancient Norse, religion, alleged that the Ohio Department of Rehabilitation and Correction was not affording them the same right to pursue worship and study that was afforded to more "mainstream" religions groups such as Christians, Jews, or Muslims.

Early in the case, the defendants challenged the constitutionality of the Religious Land Use and Institutionalized Persons Act under which plaintiffs brought their claims. Eventually, the United States Supreme Court resolved that issue, finding that RLUIPA could constitutionally be applied in this case. See Cutter v. Wilkinson, 544 U.S. 709 (2005). After the case was remanded, the parties worked diligently to resolve the claims of the class. Those efforts resulted in the adoption of a stipulation for injunctive relief on April 19, 2010.

The stipulation resolved most, but not all, of the claims of the class. In particular, two issues were carved out for decision by the Court - whether ODRC must, in the absence of a court order, recognize the Asatru religious name of an inmate, and whether Asatru inmates are exempt from ODRC's grooming code. Stipulation for Injunctive Relief, Doc. #507, ¶14. The amended

complaint also contained a claim about responses to grievances, but the Court concludes, as noted in defendants' reply, that this claim has essentially been abandoned.  In accordance with the schedule established by the Court, defendants moved for summary judgment on these two issues on August 24, 2010.  The motion is now fully briefed.  For the following reasons, the Court grants summary judgment on these claim.  Because this order, together with the prior stipulation and the severance of individual claims which is ordered below, resolves all of the claims in this case, the case is now closed and will be terminated on the Court's docket system.

I.

Summary judgment is not a substitute for a trial when facts material to the Court's ultimate resolution of the case are in dispute.  It may be rendered only when appropriate evidentiary materials, as described in Fed. R. Civ. P. 56(c), demonstrate the absence of a material factual dispute and the moving party is entitled to judgment as a matter of law.  Poller v. Columbia Broadcasting Systems, Inc., 368 U.S. 464 (1962).  The moving party bears the burden of demonstrating that no material facts are in dispute, and the evidence submitted must be viewed in the light most favorable to the nonmoving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970).  Additionally, the Court must draw all reasonable inferences from that evidence in favor of the nonmoving party.  United States v. Diebold, Inc., 369 U.S. 654 (1962). The nonmoving party does have the burden, however, after completion of sufficient discovery, to submit evidence in support of any material element of a claim or defense on which that party would bear the burden of proof at trial, even if the moving party has not submitted evidence to negate the existence of that material fact.  See Celotex Corp. v.Catrett, 477 U.S. 317 (1986); Anderson v.

Liberty Lobby, Inc., 477 U.S. 242 (1986).  Of course, since "a party seeking summary judgment ... bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact," Celotex, 477 U.S. at 323, the responding party is only required to respond to those issues clearly identified by the moving party as being subject to the motion.  It is with these standards in mind that the instant motion must be decided.

II.

Defendants' motion for summary judgment lays out the pertinent facts, most of which are undisputed.  As the defendants' motion does, this Opinion will recite the facts separately for each of the two remaining claims.

A.  Grooming

The Ohio Department of Rehabilitation and Correction has adopted grooming standards for inmates, found at Ohio Administrative Code §5120-9-25.  In pertinent part, that regulation provides that "[i]nmates shall be required to be neat and well groomed" and that they must "conform their appearance to the standards set forth" in the regulation.  As far as hair style or length is concerned, the regulation says that "[h]air shall be clean, neatly trimmed, shall not extend over the ears or the shirt collar and shall not protrude more than three inches from the scalp."  Specific hairstyles are also prohibited, and the regulation reserves to the ODRC the right to prohibit other types of hairstyles "if they are determined to be either a threat to security or contrary to other legitimate penological concerns, as determined by the office of prisons."  The regulation does recognize that the hairstyles required by some religions may be in conflict with the general grooming regulations, and provides that "[i]f the grooming restrictions established by

3

this rule substantially burden an inmate's sincerely held religious belief, the inmate may seek an appropriate exemption by applying for a religious accommodation [sic]." O.A.C. §5120-9-25(O).

According to an affidavit signed by Wanza Jackson, ODRC's Religious Services Administrator, most inmates who request a religions accommodation for their hairstyles receive one. The only hairstyle not permitted is dreadlocks. That style is prohibited because it is too easy for inmates to conceal contraband in dreadlocks. Ms. Jackson's affidavit states that at least one Asatru inmate has applied for and received a religious exemption allowing him to wear long hair and a beard. All such requests are dealt with pursuant to the ODRC's policy statement on religious accommodations (ODRC Policy 72-REG-02), which states that the ODRC "will seek to meet inmate religious needs within the unique parameters of the correctional setting" and that specific procedures must be followed by an inmate requesting an accommodation. The inmate asking for an accommodation must make a written request and submit it to the institution's chaplain. The procedures then call for review of the request by a committee and the managing officer of the institution, either of which may grant or deny the request. Appeal rights are also spelled out in the regulation. <u>See</u> Jackson Affidavit, first attachment.

### B.  Name Changes

ODRC also has a policy concerning inmate names. A copy of that policy (07-ORD-04) is attached to the affidavit of Edwin C. Voorhies, Jr., the Deputy Director of the Office of Prisons. The name which ODRC uses for all inmates is, initially, the name under which the inmate was convicted. The inmate continues to be listed under that name unless he or she completes legal proceedings to change his or her name. If that happens, the new name is added

to the prison record as an "also known as," or "AKA."  The inmate also obtains a new identification badge and clothing with the AKA name indicated.  The ODRC does not, however, remove the prior name from the inmate's record.

The policy applies only to official matters requiring the use of an inmate's name. Inmates remain free to refer to themselves and each other by nicknames or other names. However, according to Mr. Voorhies, it would be a significant burden to the operation of the prison system if inmates were permitted to change their official names at will due to the record-keeping a record-checking issues that would be created by that practice.

III.

Plaintiffs have argued that these two policies, or the way in which they are applied, violate their rights under either RLUIPA or the United States Constitution.  In order to analyze these claims, the Court will first set out what constraints are found either in RLUIPA or the applicable provisions of the Constitution on the way in which state officials administer their prison systems.  The Court will then examine whether there are any factual disputes about either the way in which the policies at issue in this case operate or the penological concerns upon which they are based.  If not, the Court will proceed to determine if the operation of these policies comports with the statutory and constitutional duties imposed upon prison officials to accommodate the religious needs of the inmate population.

A.

As the Supreme Court explained in Cutter v. Wilkinson, "Section 3 of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA ...), 114 Stat. 804, 42 U.S.C. § 2000cc-1(a)(1)-(2), provides in part: 'No government shall impose a substantial burden on the

religious exercise of a person residing in or confined to an institution,' unless the burden furthers 'a compelling governmental interest,' and does so by 'the least restrictive means.'" Cutter, 544 U.S. at 712.  Under this standard, which was upheld in Cutter against a constitutional challenge based on the Establishment Clause, prison officials are required to make reasonable accommodations to the religious practices and preference of inmates, and simply demonstrating a reasonable nexus between prison security or administrative issues and the challenged restriction of a prisoner's right to the free exercise of religion is no longer sufficient, as it was under decisions such as Turner v. Safley, 482 U.S. 78 (1987).  However, a great deal of discretion is still afforded to prison officials to determine what are the least restrictive means available to accommodate a religious practice, and RLUIPA is not a wholesale invitation to the courts to substitute their judgment for that of experienced prison officials.  See Hoevenaar v. Lazaroff, 422 F.3d 366, 370 (6th Cir. 2005).  Nevertheless, the Court is not required to take the opinions of prison officials as to such issues at face value, nor should it uphold prison restrictions on the practice of religion which are frivolous or arbitrary.  See Buchanan v. Burbury, 2006 WL 2010773 (N.D Ohio July 17, 2006).  With these general principles in mind, the Court will turn to the analysis of each of the remaining claims.

B.

The current regulation concerning religious accommodation, which is the one under which inmates may apply for an exception to the grooming code, became effective on March 4, 2010.  It provides, in Section IV, that:

> It is the policy of the Ohio Department of Rehabilitation and Correction that inmates have freedom of conscience to seek and/or subscribe to any religious belief.  The Department will seek to meet inmate religious needs within the unique parameters of the correctional setting.  When an inmate makes a request

6

that is not addressed directly within policy, he or she shall have recourse to make this known to the institution.  The decision whether or not and how a request is to be accommodated will be made according to the procedures in this policy directive.  This decision shall consider:

> • the extent to which the request reflects or is based upon a sincerely held religious belief;
> • available resources;
>
> • adequacy of existing practices;
>
> • the operational concern for safety, security, and the good order of institutions; and
>
> • any other legitimate penological concerns.

Because the class action aspect of this case involves only claims for prospective injunctive relief, it is this regulation, rather than any predecessor regulation or practice, which is at issue for purposes of the summary judgment motion.  Further, because this regulation has been applied only a handful of times to Asatru inmates, there is not a great deal of evidence as to how ODRC officials apply its provisions to requests made by such inmates for religious accommodation.  Thus, the primary challenges brought by the plaintiff class are to the regulation on its face.  These facial challenges include the arguments that 72-REG-02 is unconstitutionally vague, that it improperly permits prison officials to evaluate the orthodoxy of an inmate's religious beliefs, and that it violates the equal protection clause because it draws irrational distinctions between male and female inmates.  The Court will examine each of these arguments in turn.

<u>The Vagueness Challenge</u>

Plaintiffs mount a two-pronged assault on 72-REG-02 as being void for vagueness.  First, they claim that it provides ODRC chaplains with no guidance about how to interpret various concepts included within the regulation, including how to determine the sincerity of an inmate's

religious belief and how to interpret the phrases "the adequacy of existing practices" and "other penological interests." Second, they claim that it does not supply the decision-maker with any standards for weighing these various interests.

In the First Amendment area, the "void-for-vagueness" doctrine developed largely in response to state or local laws which were both problematic in terms of defining the conduct they intended to prohibit, and which, due to that defect, caused citizens to avoid engaging in speech or conduct which was protected by the First Amendment.  See, e.g., Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).  As the Court observed in Grayned, "where a vague statute 'abut(s) on sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of (those) freedoms.'  Uncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone ... that if the boundaries of the forbidden areas were clearly marked.'" Id. (footnotes omitted).  The Court also reiterated the concept that laws must, in order to comport with due process, "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly," and "if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them." Id.

Prison regulations are not often challenged on vagueness grounds.  In fact, some courts have held that this doctrine and its frequent companion, the First Amendment overbreadth doctrine, do not "apply with independent force in the prison-litigation context."  Waterman v. Farmer, 183 F.3d 208, 213 (3d Cir. 1999); see also Ustrak v. Fairman, 781 F.2d 573, 580 (7th Cir. 1986).  According to Waterman, the principles which are protected by this doctrine are adequately subsumed within the general tests developed for determining if prison regulation of

inmates' First Amendment activities are constitutional.  Although the Waterman court was using

the Turner v. Safley test, its rationale applies equally to the RLUIPA test, which simply applies a

heightened standard of scrutiny to inmate religious freedom claims.  Similarly, in Ustrak, the

court held that these two doctrines 'have only limited relevance to a sphere where the right of

free speech is limited."  Ustrak, 781 F.2d at 580. Other courts have noted that the void for

vagueness doctrine was developed primarily in the context of criminal statutes and that a relaxed

version of the text applies to regulations that are not intended to define criminal behavior.  See,

e.g., Brennan v. Occupational Safety and Health Review Comm'n, 505 F.2d 869, 872 (10th Cir.

1974); see also Exxon Corp. v. Busbee, 644 F.2d 1030 (5th Cir. 1981); Smith v. Campbell, 2006

WL 2597837 (M.D. Ala. September 11, 2006) (applying a relaxed standard to prison

regulations).  It is not as clear that this lenient standard, described in Busbee as an inquiry into

whether the regulation is "'so vague and indefinite as really to be no rule or standard at all,'" id.

at 1033, quoting A.B. Small Co. v. American Sugar Refining Co., 267 U.S. 235, 239 (1925),

applies equally to prison regulations that implicate First Amendment interests.  However, it is

apparent that the standards cited by plaintiffs from the Supreme Court's decision in Kolender v.

Lawson, 461 U.S. 352 (1983), a case involving a criminal statute which required persons

loitering on the streets to produce reliable identification, cannot simply be applied directly to this

very different context.

Rather, the Court must take the context into account and, if it applies the doctrine at all, must do

so in a way that recognizes the nature of the regulation at issue and the setting in which it is to be

applied.

　　　　To begin with, the Court notes that the prohibitory portion of the prison grooming

regulation is not vague at all.  It specifically prohibits facial hair and hair over a certain length, and plaintiffs do not argue that a reasonable inmate would not understand what conduct is, absent an accommodation, prohibited or for what grooming offenses they may be punished.  Their attack focuses exclusively on the regulation that allows prison officials to make exceptions.  Thus, the only part of any vagueness test that would appear to be implicated here is the portion which captures the courts' concern that a statute or regulation may be so standardless as to provide no guidance whatsoever to the officials called upon to interpret it.

Assuming, without deciding, that some variation of the void for vagueness test can properly be applied to ODRC Policy 72-REG-02, the Court does not find it to be so lacking in guidance that prison officials are free to make arbitrary decisions with regard to religious accommodations.  Phrases such as "the adequacy of existing practices" and "other legitimate penological concerns" are intelligible.  The former clearly refers to whether there is a way within the existing prison structure for the inmate to express his or her religious views on a subject other than in the specific way requested by the inmate as an accommodation.  The reference to penological interests is generally understood to require an inquiry into whether any legitimate interest of the prison would be affected by allowing the requested accommodation.    Further, this regulation was not adopted in a vacuum.  For example, there is a substantial body of case law dealing with the issue of what is a legitimate penological concern.  Given the prevalence of that language in the case law and the fact that prison officials are assumed to be knowledgeable of the legal context in which they operate, there is substantial guidance available to them to determine what interests are penological (i.e. which relate to the operation of a prison), and which have been found by courts over the years to be legitimate.  The same can be said of the

10

phrase "sincerely held religious belief," which, as one court has observed, has been in use in the case law for more than fifty years.  See Watts v. Florida Intern. Univ., 495 F.3d 1289, 1294 (11th Cir. 2007).  Courts have also had little difficulty in determining that the word "religious" has a common meaning and that "persons of ordinary intelligence - perhaps after some thought - can understand [it]."  Trinity United Methodist Parish v. Board of Education, 907 F.Supp. 707, 718 (S.D.N.Y. 1995).  The existence of this type of interpretive aid can render regulations intelligible even if their meaning might otherwise be somewhat inscrutable.  Cf. Gentile v. State Bar of Nevada, 501 U.S. 1030, 1049 (1991) (recognizing that a vagueness problem may exist if the terms used in a regulation "have no settled usage or tradition of interpretation in law").

Finally, the statutory and case law applicable to this area, including RLUIPA itself, give guidance as to how to weigh these factors.  RLUIPA mandates that prison officials impose substantial burdens on any particular religious practice only when a compelling governmental interest would be implicated if the practice were permitted, and that the prison choose the least restrictive means available, among various alternatives, when considering what type of restriction to impose.  It is also true that any decision of prison officials under this regulation would be subject to an "as-applied" challenge in which a court could and would apply these relatively well-defined standards.  Under these circumstances, plaintiffs' facial vagueness challenge, even if cognizable, lacks merit.

### The "Orthodoxy" Challenge

Next, plaintiffs claim that 72-REG-02 violates the First Amendment because it permits (and may even require) prison chaplains and other prison officials to make a determination about whether the religious practice for which an accommodation has been requested is part of the

"orthodox" practice of a particular religion or central to the observance of that faith. Although the regulation does not use those terms, it does invite an inquiry into whether, in the language of the regulation, "the request is consistent with the established traditions of the [inmate's] faith group, although that factor need not be controlling." Additionally, the inmate, in his or her request, is required to identify the "basis for the requested religious practice (origin of request in the writings or traditions of the faith group) ...." See 72-REG-02, Section V. Plaintiffs, using as an example the accommodation request made by named plaintiff Roy Slider, argue that these inquiries are impermissible. Mr. Slider was initially denied an exemption to the grooming code because his institutional chaplain determined that he did not show a sincere belief, based on his faith or the documentation he supplied, in the need to grow hair in a way that violated the grooming regulation. That decision (which was later overturned, at least on a temporary basis) relied in part on the chaplain's interpretation of an Asatru religious text which, in the chaplain's view, did not provide any support for the requested accommodation.

As plaintiffs point out, inquiries into the validity of a citizen's religious beliefs "are inquiries foreclosed to Government." United States v. Seeger, 380 U.S. 163, 184 (1965). In that case, which involved a request for conscientious objector status in response to a draft notice, the Supreme Court held that the draft board's inquiry was properly confined to the issue of whether the draftee's purported beliefs were "sincerely held and whether they are, in his own scheme of things, religious." Id. at 185. RLUIPA also recognizes the limited role of government in picking and choosing among religious beliefs, providing, in 42 U.S.C. §2000cc-5(7), that "[t]he term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." The statute uses this phrase in §20000cc-1(a) in stating the general

12

rule that the government may not "impose a substantial burden on the religious exercise of a person residing in or confined to an institution ...."  Thus, if the regulation at issue allows an accommodation to be denied because the inmate wishes to engage in what is clearly a "religious exercise" but prison officials question whether that exercise is either compelled by or central to the inmate's faith, that would appear to violate both RLUIPA and the case law interpreting the permitted role of the government in this area.

It should be noted, at the outset, that the "sincerity" provision of the regulation is not being challenged.  Cutter recognized the validity of this type of inquiry, noting that "prison officials may appropriately question whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic. Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion, see 42 U.S.C. §2000cc-5(7)(A), the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity."  Cutter, 544 U.S. at 725 n.13.  The professed reason for denying Mr. Slider his accommodation was, in fact, that his belief about the need to refrain from cutting his hair was not sincerely based either on his faith or the documentation he supplied.

Clearly, if Regulation 72-REG-02 allows the institution to deny an inmate's request to engage in a *bona fide* religious exercise solely on grounds that engaging in that exercise is not consistent with the established traditions of that inmate's faith group, its validity would be problematic.  However, the regulation makes clear that this factor is not determinative.  Further, the Court concludes that some inquiry in this area is permissible, if for no other reason than to allow the institution to gauge the sincerity of the inmate's belief, which is a permissible inquiry. For example, if a Muslim inmate requested a diet free of pork products, there would be little

13

reason, based on the generally-understood traditions and teachings of Islam, to question the sincerity of the inmate's belief in the necessity for such a dietary restriction.  If the same request came from a Lutheran inmate, the institution might well be justified in asking for some evidence that refraining from eating pork is part of traditional Lutheran teachings, and, if there is no evidence that any Lutheran theologian has ever suggested that Lutheran teachings include such a dietary restriction, the institutional chaplain might be justified - after discussing the matter with the inmate and attempting to determine the reasons why the inmate believes that the restriction is mandated by his or her Lutheranism - in concluding that the inmate's professed belief in the religious nature of the dietary restriction is not sincere.  Thus, although there is a certain amount of overlap in the two concepts, the Court does not read either RLUIPA or the existing First Amendment jurisprudence to forbid prison officials from considering the relationship of the traditional teachings of any particular religion to an inmate's request to accommodate what he or she claims to be an exercise of that religion.

This is not to say that prison officials might not occasionally conflate these concepts in an improper manner.  Certainly, Mr. Slider's situation at least raises the question of whether that is what occurred with his request for a grooming exemption.  If, in fact, he was denied an accommodation for the sole reason that the chaplain interpreted the teachings of Asatru in a way that conflicts with Mr. Slider's sincere beliefs, some First Amendment or RLUIPA issue might arise.  However, that claim could only be raised in an as-applied challenge to the regulation, and it could not serve as the basis for a class-wide challenge to the regulation as being invalid on its face.  The Court expresses no opinion about whether, should Mr. Slider's temporary accommodation be rescinded, he might prevail in an individual challenge to that individualized

14

decision.  Rather, it simply concludes that there is no basis for striking down the regulation as

written, or excising any portion of it, on grounds that it conflicts with either the First

Amendment or RLUIPA.

The Equal Protection Challenge

Plaintiffs' final challenge to Regulation 72-REG-02 is that it makes an impermissible

distinction between male and female inmates.  Although the regulation, on its face, makes no

such distinction, plaintiffs argue that the grooming regulations found at Ohio Administrative

Code §§5120-9-25 and 5120-9-25.1 contain different standards, mandating that men's hair be no

more than three inches in length and that women's hair be at least two inches in length.  From

this, plaintiffs argue that a male inmate seeking to grow his hair longer than three inches for

religious reasons must seek an accommodation under 72-REG-02 while a female inmate with the

same desire to exercise her religion by growing out her hair need not do so.  This, plaintiffs

assert, impermissibly burdens male inmates' free exercise of religion in a discriminatory way

and therefore violates the Equal Protection Clause of the Fourteenth Amendment.

Plaintiffs cite a single decision from the Ninth Circuit Court of Appeals in support of this

argument.  In that case, Warsoldier v. Woodford, 418 F.3d 989 (9th Cir. 2005), the court was

faced with a somewhat different set of policies.  The grooming regulations themselves were

much the same as the ones adopted by ODRC, but the California prison policies at issue in

Warsoldier made "no exception for religious adherents whose faith prohibits them from cutting

their hair."  Id. at 995.  The precise question before the Court of Appeals was whether the district

court had correctly concluded that the plaintiff had shown a sufficient likelihood of success on

the merits of his RLUIPA claim to support the issuance of a preliminary injunction.  Although

15

the plaintiff had not actually been forced to cut his hair, he had been subjected to a wide variety

of punishments for not doing so.  The Court of Appeals found that his exercise of religion had

been substantially burdened by these punishments and then turned to the question of whether the

state could demonstrate a compelling state interest in prison security, and, more importantly,

whether it had chosen the least restrictive means for furthering that interest.  It was in that

context - and not in the context of an equal protection claim - that the court observed that it

seemed unlikely that the state could prove that refusing to have an exemption or accommodation

policy was the least restrictive means of furthering its security goals.  Obviously, the case is

distinguishable on the central ground that, here, the ODRC has adopted an exemption policy.

Thus, the question presented in this case, which was not addressed at all in Warsoldier, is

whether the act of having to invoke the policy is an impermissible act of discrimination based on

sex.

There do not appear to be any cases holding that prison regulations which prescribe

different hair lengths for men and women violate the Equal Protection Clause.  See, e.g. Wiley v.

Glover, 2008 WL 4629924 (M.D. Ala. Sep 03, 2008) (collecting cases).  This Court has held on

multiple occasions that the difference in grooming regulations between male and female inmates

satisfies whichever level of constitutional scrutiny that might be applied.  See Davie v. Wingard,

958 F.Supp. 1244 (S.D. Ohio 1997); Pariseau v. Wilkinson, Case No. 2:95-cv-1010 (S.D. Ohio

August 23, 1995).  Given the absence of any decisions to the contrary, and in the face of this

large body of persuasive precedent, the Court finds no merit to the Equal Protection claim made

here.  If having two sets of regulations on this subject is permissible because the distinction

made between male and female inmates is either rationally based or substantially related to

various institutional concerns, creating a means by which male inmates may obtain an exemption

from the regulation that applies only to them serves only to lessen the discriminatory impact of

the two sets of grooming regulations, and cannot itself form the basis for an independent Equal

Protection violation.

The "Name Change" Regulation

The operation of the ODRC's name change policy is explained above.  Defendants,

noting that RLUIPA places an initial burden on a plaintiff to demonstrate the existence of a

substantial burden on the exercise of religion, argue that plaintiffs cannot show that the refusal to

recognize officially their religious names constitutes any kind of burden on their exercise of

religion.  They also argue that, even if some burden could be shown, compelling interests in

security and administration outweigh the burden and that there are no less restrictive means

available to accommodate these interests.

In response, plaintiffs claim that the refusal officially to recognize a common law name

change (which is the only type of name change they seek recognition for) forces them to

"consent to being addressed solely by their names of conviction instead of their religious

names," particularly as it relates to receipt of certain entitlements such as mail and commissary

benefits.  They also assert they must respond to their names of conviction in order to avoid

discipline by staff for ignoring orders.  Plaintiffs' memorandum in opposition, at 18.  According

to plaintiffs, the existence of a burden from these requirements should be presumed at the

summary judgment stage.  For this proposition, they cite to Maier v. Swanson, 2009 WL

1439447 (D. Mont. May 14, 2009).

Maier, relying on language in, *inter alia*, Justice O'Connor's concurring opinion in

17

Employment Div., Dept. of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990), noted

that it is sometimes difficult to distinguish among the concepts of "sincerely held religious

belief," "centrality," and "burden to religious exercise."  There, the plaintiff contended that

denying him the use of Tarot cards burdened his ability to practice his religion (Wicca).  The

court assumed without deciding that such a burden existed, and recommended that summary

judgment be granted to defendants on other grounds.  Although this Court agrees that it can

sometimes be difficult to draw the appropriate lines of distinction among the various concepts

used to analyze a claim under RLUIPA or the First Amendment's Free Exercise clause, Maier

certainly does not stand for the proposition that in every such case, the existence of a substantial

burden on the plaintiff's right to religious exercise must be presumed at the summary judgment

stage.  The Court must therefore determine, in this case, exactly how, if at all, ODRC's refusal to

accord any official status to an inmate's name change beyond one which has been obtained

through appropriate legal proceedings burdens the plaintiffs' exercise of their Asatru beliefs.

The only evidence which plaintiffs submit on this issue is the affidavit of Darryl

Blankenship, aka Alfar Kynwolf.  His affidavit asserts that it is burdensome, or sometimes

impossible, for an inmate to effect a legal name change in Ohio due either to residency

requirements or the cost of such proceedings.  That burden is not a burden on the exercise of his

religion, however.  The type of burden which must be shown under RLUIPA deals with the

impact that the prison's refusal to recognize any name change other than a legal one has on the

affected inmate's ability to engage in the free exercise of his religious beliefs and practices.  As

to that issue, Mr. Kynwolf's affidavit states, in ¶s 7 and 8, that the burden exists because he is

otherwise forced to "use names imposed on my ancestors by Christians by force in the 9[th] and

10th centuries" and that the use of his Asatru name allows him to form a religious connection with his ancestors and his sacred animal, the wolf.

In order to determine if ODRC's policy substantially burdens either Mr. Kynwolf's or other Asatru inmates' ability to practice their religion, it is necessary to examine in detail the difference between the freedom which those inmates would have should ODRC recognize common law name changes and the freedom they have now.  Only if the difference between the two is substantial will the plaintiffs have met their initial burden under RLUIPA.

As it now stands, if an inmate obtains a legal name change, his or her name of conviction is not removed from ODRC's records.  However, the new name will be added to those records and added to the name of conviction on ODRC-issued clothing and identification badges.  Even without formal recognition of a name change, inmates are free to use other names, including nicknames and religious names, when referring to each other.

Given this system, Asatru inmates, even if they obtained official recognition of common law name changes, would not be able to cease being "forced" to use their names of conviction with respect to official records, clothing tags, and badges.  Rather, those names would still appear on all of those items, although the religious name would appear as an "AKA."  Further, such inmates already have the right to inform others that they would like to be referred to by their religious names, and they may use those names when referring to themselves or other Asatru inmates without incurring any penalties.  Under these circumstances, it does not appear likely that by being denied the incremental difference in name recognition accomplished by an official name change, Asatru inmates (or inmates of any other religion) are being substantially burdened in the free exercise of their religious beliefs.  See, e.g., Ashanti v. Calif. Dept. Of

19

Corrections, 2007 WL 520958, *16 (E.D. Cal. February 15, 2007)(fact that prison allowed informal use of religious name - even one obtained by way of legal name change - negated claim that "the official commitment name formally imposes a significantly great restriction upon the exercise of [plaintiff's] religion").  That is especially true given the way that this Court has characterized the concept of "substantial burden" in the past.  See, e.g., Mann v. Wilkinson, 2007 WL 4562634, * (S.D. Ohio December 21, 2007) (describing the test as whether a prison regulation either places substantial pressure on an inmate to modify his or her beliefs, or punishes the inmate if he or she chooses to act on those beliefs).

It is true, however, some courts have recognized, albeit on somewhat different facts, that forcing an inmate to use a religiously offensive name in order to receive prison services, such as withdrawing money from a commissary account, may burden an inmate's free exercise of religion.  See, e.g., Ali v. Dixon, 912 F.2d 86 (4th Cir. 1990).  Although plaintiffs do not make this exact claim, this Court will assume that there are circumstances in the prison where, absent official recognition of a name change, Asatru inmates are forced to use their name of conviction in order to receive services, and that this use is offensive to their religious beliefs.  Thus, the question becomes whether defendants have demonstrated both a compelling interest in not recognizing common law name changes and that their refusal to do so is the least restrictive means of promoting their objectives.

Deputy Director Voorhies' affidavit identifies various needs of the prison system that are served only by recognition of legal name changes, including the need to maintain an accurate record of approximately 50,000 inmates in its custody; the elimination of the administrative burden of keeping and checking records that reflect not only legal name changes but other means

of name changes; not incurring the burden of trying to operate all prison services that use prisoners' names, such as laundry, medication distribution, and commissary accounts, with frequent name changes occurring; and otherwise delaying prison staff in the orderly discharge of their daily duties. These are certainly legitimate, if not compelling, interests within a prison system, and plaintiffs do not dispute the nature of these interests. Rather, their argument focuses on the next prong of the RLUIPA test, which is whether the means chosen by ODRC to deal with the problems presented by name changes is the least restrictive alternative to accomplish ODRC's goals.

In arguing that, at the very least, there is a material factual issue on this point, plaintiffs do not rely on any evidence in the record. Rather, they contend that the impact of recognizing common law name changes spelled out in the Voorhies affidavit are "exaggerated" and that because the name of conviction is maintained even with a common law name change, "prison staff would face no additional burden in establishing an inmate's identity for delivering mail, commissary, or identification in the event that an inmate has his or her conviction or sentence modified." Plaintiffs' memorandum, at 19. They also contend that the number of additional changes to records that would be generated by recognizing common law name changes would not be significant, and that it would not be an added burden on prison officials to administer such a database.

There are a number of problems with plaintiffs' arguments, however. First, the lack of any affirmative evidence to support their factual assertions leaves the Court with the task of determining if the Voorhies affidavit, standing alone, is sufficient to meet the defendants' burden on this issue. Although that affidavit is somewhat general and does not always specifically

21

address the alternative posed by plaintiffs, which is recognition of common law name changes, it does support the proposition that there is no way apart from refusing to acknowledge such changes to further the interests which Deputy Director Voorhies has identified.  The assertion that these concerns are "exaggerated" due to the relatively small number of additional names that might have to be added to the prison name database were common law name changes to be recognized has no evidentiary support, and the Court cannot simply assume it to be true. Further, plaintiffs' argument suggests that the concerns expressed by Deputy Director Voorhies are overstated because ODRC could still use plaintiffs' names of conviction for purposes of administering the mail and commissary systems.  But if that is the case, the primary detriment that supposedly accompanies the forced use of an offensive name to obtain prison services would not be alleviated at all.  Plaintiffs cannot have it both ways.  Either the recognition of a common law name change would require the prison to change the way in which it delivers services - in which case, there would be a significant impact on prison security and efficiency - or it would not, in which case plaintiffs would not have accomplished anything of significance by obtaining ODRC's recognition of their common law name changes.  Thus, this claim fails either because the alternative practice requested by plaintiffs would not affect the substantial burden to the free exercise of religion which they claim to be inflicted by the current system, or because the elimination of that burden would threaten the state's compelling interests in the administration of its prison system without the possibility that some less restrictive policy could accomplish the same goal.

The few cases which have addressed similar issues have come to similar conclusions, primarily because the state interests in name change policies are substantial enough to outweigh

22

any burden on inmate religious freedom.  It is true, as plaintiffs point out, that many of these cases were decided prior to RLUIPA's enactment, and thus analyzed the issue under a somewhat different standard, but they do recognize the legitimacy of the state's interests in "avoiding confusion and simplifying record-keeping."  Salahuddin v. Coughlin, 591 F.Supp. 353, 359 (S.D.N.Y. 1984).  There are post-RLUIPA decisions which suggest that it is "unlikely" that similar name-change regulations "are excessively restrictive for furthering the compelling state interests in promoting institutional safety and security."  Wallace v. Miller, 2010 WL 2836987, *5 (S.D. Ill. July 20, 2010).  This Court also must keep in mind the admonition in Hoevenaar v. Lazaroff, 422 F.3d 366, 370 (6th Cir. 2005) that in making the "least restrictive means" analysis under RLUIPA, the Court must not make the mistake of "substituting its judgment in place of the experience and expertise of prison officials."  Taking all of these factors together, the Court concludes that Deputy Director Voorhies' affidavit is, on its face, sufficient to satisfy defendants' burden of demonstrating that it is using the least restrictive means to accommodate inmates who have not obtained legal name changes and that the means chosen do further compelling governmental interests.  This finding is sufficient to support the entry of summary judgment in defendants' favor on this claim.

## IV.

With the grant of summary judgment to defendants on the remaining class claims for injunctive relief, the only portion of this case which has not been resolved is the claims, if any, asserted by the three named plaintiffs for damages.  Class counsel does not represent these parties on those claims, and at this point in the litigation, it is not particularly clear which named plaintiffs wish to continue to assert individual damage claims for past actions of the defendants,

against which defendants they wish to assert those claims, and the specific content of those claims.

In order to facilitate the development and ultimate disposition of any such claims, the Court orders the following.  Any remaining individual damage claims asserted by named plaintiffs John Miller, Darryl Blankenship, Roy Slider, David Dattilo, Ben German, Rick Hall, Jeffrey Holland, Roy Howington, William Lemasters, Fred Schocke, Keith Shaffer, Matthew Stump, Shawn Summers and Joseph Taylor are hereby **SEVERED** from this case.  The Clerk is directed to open a new civil action, with a new case number, in which these named plaintiffs are designated as the plaintiffs, and any defendant who has not be terminated from this case is designated as a defendant.  Within twenty-ones days of the date that the new case is opened, any plaintiff wishing to continue to prosecute individual damage claims shall file an amended complaint identifying those claims and the defendants against whom they are asserted.  If any plaintiff fails to do so, his individual damage claims previously asserted in this action, if any, will be dismissed without prejudice.  The Court makes it clear that this severance order applies only to the named plaintiffs identified in this order.  Any class member who previously filed a motion to intervene or similar motion seeking recognition of individual claims has never been made a formal party to this case, and must, if he wishes to pursue individual claims, file a new civil action.

## V.

For the reasons stated in this Opinion and Order, defendants' motion for summary judgment on the remaining class claims for injunctive relief (#515) is **GRANTED**.  Those claims are **DISMISSED WITH PREJUDICE**.  Because the prior grant of relief to the plaintiff

class and the severance of the named plaintiffs' damages claims resolve all other issues in this case, this case is **TERMINATED.**

      **IT IS SO ORDERED.**


September 30, 2010                 /s/ Edmund A. Sargus, Jr.
**DATED**                              **EDMUND A. SARGUS, JR.**
                                  **UNITED STATES DISTRICT JUDGE**